## Insurance Exchange Surplus

64

BROWN, Deputy Attorney General, January 6, 1940.—
On July 25, 1939, you inquired concerning the Act of
June 24, 1939, P. L. 683, requesting an opinion as to how
your department shall calculate the surplus required of
an inter-insurance exchange or reciprocal, in order to per-
mit it under that act to write a nonassessable policy
where the exchange in question is writing both fire and
casualty coverages. Other questions are suggested by
this inquiry.

The Act of 1939, supra, amends section 1004(d) of
The Insurance Company Law of May 17, 1921, P. L. 682,
and reads as follows:

"A copy of the form of power of attorney, or other
authority of such attorney, under which such insurance

is to be effected or exchanged, and which shall provide that the liability of the subscribers, exchanging contracts of indemnity, shall make provision for contingent liability, equal to not less than one additional annual premium or deposit charged: Provided, however, That where an exchange has a surplus equal to the minimum capital and surplus required of a stock insurance company transacting the same kind or kinds of business, its power of attorney need not provide for such contingent liability of subscribers, and such exchange, so long as it maintains such surplus, may issue to its subscribers policies or contracts without contingent liability."

As your letter of July 25, 1939, points out, reciprocals or inter-insurance exchanges in Pennsylvania are authorized to write all classes of insurance except life insurance. That is, they may do the classes of business covered by section 202, subsecs. (*b*) and (*c*) of The Insurance Company Law of 1921, supra. Subsection (*b*) covers lines of business in which fire insurance companies engage and subsection (*c*) those in which casualty companies engage.

According to annual reports and examination reports on record in your office, while all reciprocals have, generally speaking, a similar line of business, there is some variance in what coverage they offer. But, as indicated, their coverage is in both the fire and casualty field.

Financial requirements for Pennsylvania stock fire and casualty companies are set out in section 206. The requirements for foreign stock fire and casualty insurance companies are set out in sections 516 and 601, respectively.

We feel, in view of the fact that the language of amended section 1004 does not designate whether the reciprocal, if a foreign reciprocal, must meet the requirements of section 206, or of sections 516 and 601, the intention of the legislature is that the reciprocal, whether foreign or domestic, must meet the require-

ments Pennsylvania companies are required to meet, namely, the requirements under section 206.

To calculate the amount required for each reciprocal, therefore, it will be necessary for you to determine from the examination reports and annual reports the classes of business which such reciprocal is transacting and to total the amounts of capital which both a Pennsylvania fire insurance company and a Pennsylvania casualty insurance company, doing the same lines of business that the particular reciprocal is transacting, would be required to have.

The lines usually written by a reciprocal are set out in section 202, pars. B(1) and (2), and C(3), (4), and (11). Applying section 206 to such schedule, it will be seen that a reciprocal may engage in the indicated fire insurance lines if it has a surplus of $300,000, and the usual lines of the casualty insurance if it has a surplus of $300,000, or a total of $600,000. On the basis of added classes of insurance engaged in by a reciprocal, these figures would be increased.

As is quite clear by the terms of section 1004, this must be a surplus, and the surplus of a reciprocal can be determined only by first deducting all reserves and all other liabilities.

It is understood, of course, that the annual statements and examination reports on file in your office for any reciprocal should reflect the assets of that fund, the beneficiaries of which are the subscribers, and that there has never come into such fund the compensation (which is a fixed percentage of each premium or deposit) which the attorney-in-fact for the subscribers receives.

It is upon the above basis that you have already approved nonassessable policies now being written by Consolidated Underwriters and the State Automobile Insurance Association of Indianapolis, two reciprocals admitted into this Commonwealth whose surpluses exceed the requirements.

We desire, also, to pass upon several other situations which arise because of this amendment. One question which has been raised is whether or not a nonassessable policy written by a reciprocal or inter-insurance exchange would become assessable under any circumstances. The suggestion is made that, because amended section 1004 provides that the reciprocal *maintain* the required surplus, should the reciprocal fail in this, the policy may become assessable.

This suggestion is, of course, not well founded because the legislature could never have intended that a policy which is nonassessable could or would, under any circumstances during the life of such policy, change to or become an assessable policy.

To find otherwise would be unreasonable and absurd. Section 52 of the Statutory Construction Act of May 28, 1937, P. L. 1019, provides:

"In ascertaining the intention of the Legislature in the enactment of a law, the courts may be guided by the following presumptions among others:

"(1) That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable."

Additionally, we would be ascribing to the legislature an intention to pass a law which would impair the obligation of contracts if we were to hold that the legislature, by the 1939 amendment, ever intended to authorize a reciprocal to write nonassessable policies which, in the lifetime of such policies, would become assessable.

Article I, sec. 17, of the Constitution of Pennsylvania provides:

"No *ex post facto* law, *nor any law impairing the obligation of contracts,* or making irrevocable any grant of special privileges or immunities, shall be passed." (Italics supplied.)

That is, an insurance policy is a contract between the insurer and the assured and the rights and liabilities thereunder are established for the term thereof. An intention cannot be ascribed to the legislature which would

create a situation whereby this constitutional provision would be violated.

Article I, sec. 10, of the Constitution of the United States prohibits States from passing any law impairing the obligation of contracts. The first paragraph of such section reads as follows:

"No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, *or Law impairing the Obligation of Contracts, or grant any Title of Nobility.*" (Italics supplied.)

It is our inevitable conclusion, therefore, that a nonassessable policy, once written by a reciprocal duly authorized to write the same, remains during its life a nonassessable policy; and no liability for an assessment can ever attach to the holder of such a policy.

It is, of course, required that you approve all policy forms. Therefore, a reciprocal which does qualify and which is authorized to write nonassessable policies must, nevertheless, submit to you its nonassessable policy form for approval before it may write the same.

There is one other situation which we consider of much importance. The amendment of 1939 does not impose upon you, as Insurance Commissioner, any additional duties, but a burden naturally falls upon someone to determine whether or not a qualifying reciprocal is maintaining its surplus.

The officers of a reciprocal will know before anyone if the required surplus is no longer maintained, and it is quite evident that the primary duty in this respect is upon such officers. When it appears that the surplus is no longer maintained, the officers must immediately cease issuance of nonassessable policies, notify you to that effect, and surrender their authority to write such policies.

It should be pointed out, however, that if through annual reports or examinations, or by means of other reli-

able information, it appears to you that a reciprocal has failed to maintain the required surplus, it would be your duty to withdraw immediately authority to write nonassessable policies, and to cancel all approvals of policies theretofore given.

It is our opinion, therefore, and you are accordingly advised that:

1. To calculate the surplus required of a reciprocal or inter-insurance exchange to write nonassessable policies, it will be necessary first to determine the classes or kinds of insurance which such reciprocal is writing. It will then be necessary to apply the provisions of section 206 of The Insurance Company Law of May 17, 1921, P. L. 682, to determine the amount of capital and surplus which both a stock fire and a stock casualty company would be required to have to write such classes or kinds of insurance. There must be eliminated from the financial statement of such reciprocal all reserves and all other liabilities which such reciprocal is required to make provision for, in order to determine what its surplus may be. If its surplus, so determined, equals or exceeds the required total amount, the reciprocal may be authorized to write nonassessable policies.

2. When a qualifying reciprocal is authorized by you to write a nonassessable policy, such policy remains nonassessable for the life of such policy, and no liability for assessment can ever attach to the holder of such a policy.

3. It is also necessary that qualifying reciprocals submit to you for approval all policy forms which they propose to write.

4. The primary duty to determine if a qualifying reciprocal is maintaining its surplus is upon the officers of such reciprocal, who should notify you immediately if it becomes apparent that the surplus is no longer maintained. It is your duty to examine annual reports and examination reports and also to investigate any information which appears to you reliable, in order to determine if a reciprocal is maintaining the required surplus.

In the event that the surplus is no longer maintained, the privilege to write nonassessable policies must be withdrawn immediately and approvals of all nonassessable policies canceled.